# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERT MICHAEL BASHARA,

        Defendant-Appellant.

UNPUBLISHED
September 21, 2017

No. 326324
Wayne Circuit Court
LC No. 13-008320-01-FC

Before: BECKERING, P.J., and MARKEY and RIORDAN, JJ.

PER CURIAM.

Defendant, Robert Michael Bashara, appeals as of right his jury trial convictions of conspiracy to commit first-degree murder, MCL 750.316, solicitation of murder, MCL 750.157b(2), first-degree premeditated murder, MCL 750.316(1)(a), obstruction of justice, MCL 750.505, and bribing, intimidating, or interfering with a witness, MCL 750.122(7)(b). He was sentenced to life imprisonment for his conspiracy to commit first-degree murder and first-degree murder convictions, 18 to 40 years' imprisonment for his solicitation of murder conviction, 1 to 5 years' imprisonment for his obstruction of justice conviction, and 2 to 10 years' imprisonment for his bribing, intimidating, or interfering with a witness conviction.

The thousands of pages of transcripts and lower court filings in this case unmistakably show that the defense vigorously advocated for defendant in the trial court, attempting to demonstrate reasonable doubt or error by emphasizing inconsistencies in witness testimony and isolated facts that obscure the clear trajectory of the events giving rise to Jane Bashara's murder. Belying the voluminous lower court record and the multitude of protestations by defendant to the contrary, this case is straightforward. In considering the chronology of the events giving rise to Jane's death, it is clear that the jury reached the correct result. For the reasons set forth in this opinion, we affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter arises out of the murder of Jane Bashara, defendant's wife, whose body was found in an alley behind 19416 Annott in Detroit, Michigan, on January 25, 2012. An autopsy confirmed that the manner of death was homicide, and the cause of death was strangulation. However, the medical examiner also concluded that Jane "sustained . . . multiple blunt trauma," meaning that she was beaten.

-1-

The testimony at trial showed that defendant and Jane experienced marital and financial struggles in the years leading up to her death. Defendant had erectile dysfunction and was interested in types of intimacy in which Jane had no interest. Within that same timeframe, defendant became increasingly involved in the "bondage, discipline, and sadomasochism" ("BDSM") lifestyle, without Jane's participation. He frequently attended events with others involved in the local BDSM community and initiated relationships with other women who were also interested in that type of relationship. In 2008, he became involved in a serious relationship with Rachel Gillett, whom he met on an adult website. He also had intimate encounters with other women that he had met online between 2008 and 2012.

When first meeting women online, defendant consistently presented himself as being divorced or widowed. In spite of this, each of the women later learned that defendant was, in fact, married. However, defendant unfailingly told each woman that he and Jane were separated or no longer had a relationship, and that the couple intended to divorce after their children had completed their schooling.

Trial testimony confirmed that defendant's marital status became an issue as his relationship with one woman, Rachel Gillett, progressed. Gillett broke up with defendant numerous times based on the fact that he was still married, but defendant went to great lengths during each breakup to reassure Gillett that he loved her, that he wanted to "have a life" with her in the future, and that he would soon be divorcing Jane. Gillett remained with defendant, and the couple began looking for houses together in 2011. Ultimately, a seller accepted the couple's offer on a home on Kensington Avenue in Grosse Pointe Park. A closing date was set for January 27, 2012, and in the months leading up to the closing, defendant consistently told the realtors involved in the deal that he was divorced.

Within this same time period, defendant and Gillett looked for a third person to join their relationship and live with them in the new house. Defendant corresponded with and visited Janet Leehmann between November 2011 and January 2012, specifically indicating that he wished for her to live with him and Gillett in the house on Kensington after it was purchased at the end of January 2012.

Meanwhile, in the fall of 2011, defendant met Joseph Gentz. Gentz needed housing and employment, and he hoped that defendant could help because defendant owned an apartment complex as well as other rental properties. Numerous witnesses testified that Gentz exhibited mental disabilities or some sort of cognitive deficit. With significant assistance from defendant, Gentz did secure an apartment rented out to him by one of defendant's acquaintances. In the subsequent months, defendant and Gentz remained in continuous contact by phone.

Between August 2011 and January 2012, defendant asked several people if they were aware of anyone who could "rough up," "take care of," "run over," or "T-bone" a female tenant who was "making [his] life miserable." Within that same time period, Gentz also asked friends if they would be willing to assist him with a "hit-and-run" job for his friend "Bob," who wanted his wife killed in exchange for a few thousand dollars and a Cadillac. During these conversations, Gentz relayed specific details about "Bob's" wife, including, for example, the fact that she was a high-level executive who worked in downtown Detroit, the time at which she left work, and the specific route that she took home each day. Gentz mentioned the hit-and-run plan

to at least one other acquaintance as well, stating that the friend who wanted the act performed was named "Bashar, Bashar." He also told his landlord in January 2012 that he would be "coming into money" in the near future.

On January 20, 2012, Gillett sent an email to defendant, requesting to see divorce papers because she wanted to make sure that defendant actually was divorced before she signed financial documents to purchase a home with him. Three days later, the closing packet for the Kensington house was finalized, and defendant came into the realtors' office to pick it up at approximately 3:00 p.m. on January 24, 2012, the day of Jane's death. Defendant brought with him a conditional certificate of occupancy, which was dated January 23, 2012. The deal remained scheduled to close on Friday, January 27, 2012.

One of the realtors called defendant around 5:00 p.m. on January 24, 2012, to ask if he wanted to do a final walk through before the actual closing. Defendant said yes, stating that he wanted to do the final walk through at 2:00 p.m. on January 27, 2012. As of January 24, 2012, there was no financing in place for the house on Kensington, but the realtors thought that the deal was going to close, despite the lack of documentation regarding the financing of the home. Defendant had told them not to worry about the money; he had most of it and was going to obtain the rest of it before the closing.

Jane arrived home around 4:45 p.m. on January 24, 2012. As she pulled into the driveway, she told her daughter on the phone that she would call her back once she was situated inside. Jane never spoke to her daughter again. Between 4:40 p.m. and 6:26 p.m., Jane's phone utilized cell sites in the geographic area consistent with the Basharas' residence. Based on the cell site data, Jane's phone moved away from the Bashara residence and into Detroit beginning around approximately 6:30 p.m.. After 8:42 p.m., and until her body was found in the morning on January 25, 2012, Jane's phone used one particular cell site north of 19416 Annott Street. After 5:00 p.m. on January 24, 2012, all of the calls on Jane's cell phone were incoming calls.

Later in the evening on January 24, defendant called the police as well as numerous family members and friends—including Gillett—expressing concern that Jane was missing because she had failed to meet him at home at a designated time to discuss the couple's taxes. Defendant continued to call the police and other individuals throughout the night and into the morning.

On January 25, 2012, after Jane's body had been found, police officers went to the Bashara residence to notify defendant of Jane's death. The officers testified that defendant's reaction to the news seemed unusual, as he did not exhibit "a lot of reaction" or "emotion." However, other friend and family members present during that time testified that defendant exhibited grief and anguish.

On January 25, 2012, Gentz was seen with $800 or $900 in cash, and he later purchased a new, expensive phone. The following day, defendant dropped off an envelope for Gentz at the thrift store where Gentz volunteered, telling the woman who received the envelope that payment for a job was enclosed.

After Jane was found, defendant offered various theories regarding the likely perpetrator

and motive for the crime. These theories changed over time, especially after specific pieces of information were publicized by the media. Defendant also provided changing accounts to other people and the media regarding where he was at various times during the evening Jane was murdered.

After Jane's death, defendant maintained that he had been working at his rental properties or at the Hard Luck Lounge the entire evening. Correspondingly, after 5:15 p.m. on January 24, 2012, defendant was seen several different times at the Hard Luck Lounge—which was located on the first floor of one of his rental properties—or outside the apartment complex located at the same location. However, after it became apparent that he went home at some point during the evening, defendant said that he briefly stopped at home to pick up some keys in between other activities that night. Consistent with his account, defendant's phone utilized cell sites located in the geographical area encompassing the Hard Luck Lounge between 4:52 p.m. and 5:20 p.m. However, around 6:26 p.m., defendant's phone and Jane's phone both used the same tower near the Bashara household. At approximately 6:26 or 6:28 p.m., both phones began to move away from the area of their home. Jane's phone began to move north, and defendant's phone also began to move, using the cell tower close to the Hard Luck Lounge shortly thereafter.

Ultimately, defendant identified Gentz as the likely murder suspect. On January 28, 2012, defendant's first attorney delivered a letter to the Grosse Pointe police identifying "Joseph Goetz" as a possible suspect based on defendant's account of threatening or bothersome interactions with "Goetz" shortly before Jane's murder. However, numerous individuals, including Gillett, testified that they had never heard defendant mention Gentz before Jane's death and never heard defendant state that Gentz was threatening or harassing him before the murder. Shortly thereafter, Gentz turned himself into the police and confessed to the murder, stating that he murdered Jane in the garage of the Basharas' home while defendant threatened him at gunpoint. Gentz later pleaded guilty to second-degree murder.

In the months following Jane's death, defendant engaged in several incriminating behaviors. He repeatedly attempted to contact Gillett, even after she obtained a personal protection order ("PPO") against him, so he could tell her that he still loved her and wanted to have a life with her in the future, among other things. In addition, he attempted to enlist Leehmann to hide Gillett from the police, and he also took various actions in order to ensure that he was presented positively to the police and the media by family members, friends, and acquaintances. Further, he asked at least two individuals to call in tips or post information online identifying individuals other than Gentz as perpetrators of the murder. Defendant also repeatedly attempted to pay individuals to murder Gentz, as well as other people.[1] Although defendant told some people that he wanted Gentz killed in order to avenge Jane's death, he told Steve Tibaudo that he needed Gentz killed because "it would be his life" if Gentz were found competent to stand trial. Similarly, when defendant's cellmate, with whom defendant had conspired for other

---

[1] Law enforcement recorded several of defendant's conversations with Steve Tibaudo, during which defendant solicited Tibaudo to murder Gentz. Defendant ultimately pleaded guilty to solicitation based on these attempts to kill Gentz.

"hits," stated that defendant had his wife killed, defendant replied—referring to Gentz—" 'That's why I need that f***er dead.' "

The jury convicted defendant as previously stated. After holding a postconviction hearing that spanned 12 days, the trial court denied defendant's motion for a new trial. Defendant now appeals as of right.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant claims that his right to effective assistance of counsel was violated on several grounds. We disagree.[2]

### A. STANDARD OF REVIEW AND APPLICABLE LAW

"A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008), citing *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). However, our review of defendant's unpreserved claims "is limited to errors apparent on the record." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

"[I]n order to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "The defendant bears a heavy burden on these points. Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *Petri*, 279 Mich App at 410-411 (quotation marks and citations omitted).

Additionally, defendant carries the burden of establishing the factual basis of his claim.

"To the extent that [a defendant's] ineffective assistance claim depends on facts not of record, it is incumbent on him [or her] to make a testimonial record at the trial court level in connection with a motion for new trial which evidentially supports his claim and which excludes hypotheses consistent with the view that his trial lawyer represented him adequately." [*People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999), quoting *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973).]

---

[2] Many of defendant's ineffective assistance of counsel claims are related to issues analyzed later in this opinion. Those claims will be discussed in conjunction with the other issues.

## B. FAILURE TO PRESENT EVIDENCE AND WITNESSES

Defendant first argues that defense counsel provided ineffective assistance when they failed to present witnesses and evidence desired by defendant. To fulfill his heavy burden of establishing ineffective assistance of counsel based on counsel's failure to present witnesses or evidence, see *Petri*, 279 Mich App at 410-411, defendant must demonstrate that counsel's failure to call the specified witnesses or evidence deprived him of a substantial defense, see *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009). "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

Defendant names four categories of evidence that he wanted presented at trial.[3] Although defendant elicited testimony concerning these claims during the extensive postconviction proceedings, defendant has provided no explanation or argument on appeal regarding how defense counsel's failure to present this evidence fell below an objective standard of reasonableness, or how the outcome of the trial would have been different but for defense counsel's failure to do so. *Vaughn*, 491 Mich at 669. More importantly, he has provided no explanation or argument concerning how defense counsel's failure to present the cited witnesses, documents, and evidence deprived him of a substantial defense. See *Russell*, 297 Mich App at 716. Thus, we deem these claims abandoned[4] and conclude that defendant has failed to fulfill his burden of establishing that he is entitled to a new trial, see *Petri*, 279 Mich App at 410-411.

Even if we were to consider defendant's claims in light of the arguments and testimony presented at the postconviction proceedings, we would conclude that the record clearly shows that defendant has failed to establish that defense counsel's failure to present the cited evidence fell below an objective standard of reasonableness and has failed to establish he was deprived of a substantial defense for the reasons stated in the prosecution's brief on appeal. Defendant failed to establish the factual basis of many of his claims in the trial court. See *Hoag*, 460 Mich at 6. To the extent that he did provide a factual basis of his claims, defense counsel's detailed explanations regarding why they decided not to present the evidence clearly demonstrated that their decisions were supported by sound trial strategies. See *Petri*, 279 Mich App at 410-411.

---

[3] Specifically, defendant wanted counsel to present (1) testimony from inmates who stayed with Gentz at the Macomb Correctional Facility; (2) testimony from Grosse Pointe Park Police Chief David Hiller; (3) medical records from Jane's obstetrician-gynecologist; and (4) testimony from Dennis Gentz.

[4] See *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004) ("The failure to brief the merits of an allegation of error constitutes an abandonment of the issue."); *People v Harris,* 261 Mich App 44, 50; 680 NW2d 17 (2004) (also holding that because the defendant failed to support his claim with any meaningful analysis, the issue was abandoned); *People v Traylor*, 245 Mich App 460, 464; 628 NW2d 120 (2001).

Accordingly, the trial court's findings were not clearly erroneous, and the court properly concluded that defendant was not entitled to a new trial. See *id.* at 410.

In his Standard 4 brief, defendant argues that defense counsel provided ineffective assistance when they failed to present two witnesses.[5] Again, defendant has failed to explain how defense counsel's failure to call these witnesses deprived him of a substantial defense. See *Russell*, 297 Mich App at 716. Furthermore, defendant did not provide affidavits or postconviction testimony showing how these witnesses would have testified if they had been called by the defense at trial. Defendant has failed to establish the factual basis of his claim.[6] See *Hoag*, 460 Mich at 6.

## C. FAILURE TO ADMIT GENTZ'S STATEMENTS UNDER MRE 803(b)(3) OR MRE 806

In conjunction with his argument regarding the trial court's admission of Gentz's statements under MRE 801(d)(2)(E), discussed later in this opinion, defendant contends that defense counsel provided ineffective assistance when they failed to seek the admission of Gentz's statements to the police and the prosecution under MRE 804(b)(3) or MRE 806. This claim also fails.

Our review of this unpreserved claim is limited to "errors apparent on the record." *Matuszak*, 263 Mich App at 48. The lower court "record," however, does not include the transcripts of Gentz's statements to the police, which were attached to defendant's motion for reconsideration and were again attached to defendant's motion to remand filed in this Court. The trial court denied defendant's motion for reconsideration without providing any reasoning and without admitting the exhibits into the trial court record, and this Court denied defendant's motion to remand in order to supplement the record. *People v Bashara*, unpublished order of the Court of Appeals, entered November 23, 2016 (Docket No. 326324). Thus, these transcripts were not presented to the court in accordance with defendant's burden of establishing, "at the trial court level," the factual predicate for an ineffective assistance of counsel claim. *Hoag*, 460 Mich at 6. As a result, consideration of these transcripts in conjunction with defendant's claim of ineffective assistance would constitute an improper expansion of the record on appeal. See *People v Gingrich*, 307 Mich App 656, 659 n 1; 862 NW2d 432 (2014); *People v Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008). Cf. *Maiden v Rozwood*, 461 Mich 109, 127 n 9; 597 NW2d 817 (1999). The existing record includes absolutely no support for defendant's claim that defense counsel erred when they failed to present Gentz's statements to the police under MRE 804(b)(3) or MRE 806. See *Matuszak*, 263 Mich App at 48.

---

[5] Specifically, defendant wanted to call (1) Greg Barraco and (2) Dennis Gentz.

[6] Furthermore, defendant fails to acknowledge that the parties stipulated to the reading of Greg Barraco's preliminary examination testimony into the record due to Barraco's unavailability as a result of ongoing hospitalization during trial. Because his testimony tended to inculpate defendant, defendant has failed to establish any probability that calling Barraco as a defense witness would have resulted in a different verdict at trial. See *Vaughn*, 491 Mich at 669.

Furthermore, even if we consider the transcripts of Gentz's interviews with the police, defendant has failed to show that he is entitled to relief. Defendant does not identify which statements defense counsel should have presented, and Gentz's statements repeatedly emphasized defendant's involvement in the murder. There is no indication that defense counsel's failure to seek admission of those statements fell below an objective standard of reasonableness. See *Vaughn*, 491 Mich at 669.

### D. FAILURE TO PRESENT EXCULPATORY EVIDENCE

In his Standard 4 brief, defendant contends that defense counsel provided ineffective assistance when they failed to introduce at trial a "late bill" indicating that defendant had previously refused to pay Gentz for a repair job, such that "Gentz felt entitled to payment." Defendant contends, "Joseph Gentz is prone to violence and anger and evidence of this bill would have provided a substantial defense as to why he [entered the Basharas' home and] murdered [Jane] without participation by [defendant]." We reject defendant's claim because he has failed to establish that counsel's failure to present this bill deprived him of a substantial defense. See *Russell*, 297 Mich App at 716. Instead, our review of the trial transcripts confirms that defendant clearly presented this claim to the jury through other witnesses' testimony, including testimony some restating his own statements, as well as defense counsel's arguments. Despite this presentation, the jury convicted defendant on all counts. As a result, defendant has failed to establish that there is a reasonable probability that the outcome of the trial would have been different but for defense counsel's failure to introduce the bill. See *Vaughn*, 491 Mich at 669.

### E. FAILURE TO USE A COURT-APPOINTED INVESTIGATOR

The record also does not support defendant's Standard 4 brief claim that defense counsel failed to use a court-appointed investigator and that defense counsel "floundered in confusion[.]" At the postconviction hearing, both defense attorneys and both defense investigators provided extensive testimony regarding the ways in which defense counsel utilized the investigators and the specific tasks that the investigators accomplished on behalf of the defense. The portions of the October 3, 2014 motion hearing transcript quoted by defendant in his brief are taken out of context and constitute a mischaracterization of the record.

Defendant has failed to establish ineffective assistance of counsel. See *Hoag*, 460 Mich at 6; *Vaughn*, 491 Mich at 669.

### III. VENUE AND JURY SELECTION PROCEDURES

Defendant argues the venue of this case and the jury selection procedures violated his right to a fair trial in light of the pretrial publicity of this matter. We disagree.

### A. STANDARD OF REVIEW

Our review of these unpreserved[7] claims is limited to plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).[8]

## B. VENUE

First, defendant argues that his right to a fair trial was violated because venue was improper in Wayne County. We disagree.

As a general rule, a defendant must be tried in the county where the underlying crime was committed. MCL 600.8312(1); *Jendrzejewski*, 455 Mich at 499; *People v Unger*, 278 Mich App 210, 253; 749 NW2d 272 (2008). " 'An exception to the rule provides that the court may, in special circumstances where justice demands or statute provides, change venue to another county.' " *Unger*, 278 Mich App at 254, quoting *Jendrzejewski*, 455 Mich at 499-500. However, a trial court has no obligation to change sua sponte the venue of a criminal defendant's trial. *Id.* at 254 n 12, citing MCL 762.7. This is because it is generally the obligation of a party to show good cause for a change of venue. *Id*.

Pretrial publicity, without more, is not sufficient to justify a change of venue. *Jendrzejewski*, 455 Mich at 502; *People v Harvey*, 167 Mich App 734, 741; 423 NW2d 335 (1988). Likewise, "[j]uror exposure to . . . newspaper accounts of the crime for which [the defendant] has been charged does not in itself establish a presumption that a defendant has been deprived of a fair trial by virtue of pretrial publicity." *Jendrzejewski*, 455 Mich at 502. However, "it may be appropriate to change the venue of a criminal trial when widespread media coverage and community interest have led to actual prejudice against the defendant." *Unger*, 278 Mich App at 254.

 "Consideration of the quality and quantum of pretrial publicity, standing alone, is not sufficient to require a change of venue. The reviewing court must also closely examine the entire voir dire to determine if an impartial jury was impaneled." *Jendrzejewski*, 455 Mich at 517. To determine whether a defendant has been denied a fair trial as a result of pretrial publicity, "a reviewing court must turn . . . to any indications in the totality of circumstances that [defendant's] trial was not fundamentally fair." *Id*. at 502 (quotation marks and citation omitted). Consistent with the general rule requiring the demonstration of good cause, *Unger*, 278 Mich App at 254 n 12, the defendant has the burden of demonstrating "the existence of actual prejudice or the presence of strong community feeling or a pattern of deep and bitter prejudice so as to render it probable that the jurors could not set aside their preconceived notions

---

[7] See *People v Jendrzejewski*, 455 Mich 495, 514 n 19; 566 NW2d 530 (1997); *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007); *People v Schmitz*, 231 Mich App 521, 526; 586 NW2d 766 (1998), overruled in part on other grounds by *People v Bell*, 473 Mich 275 (2005).

[8] We disagree with the prosecution that defendant waived these claims. See *People v Vaughn*, 491 Mich at 663, 663 n 74; *People v Carter*, 462 Mich 206, 214-219; 612 NW2d 144 (2000); *People v Clark*, 243 Mich App 424, 426; 622 NW2d 344 (2000).

of guilt, notwithstanding their statements to the contrary," *Harvey*, 167 Mich App at 741-742, citing *Sheppard v Maxwell*, 384 US 333; 86 S Ct 1507; 16 L Ed 2d 600 (1966).

On appeal, defendant argues that the prejudicial media coverage of him and his alternative lifestyle went far beyond mere factual reporting and permeated the community to such an extent that Wayne County was an inappropriate venue for his case. There is no dispute that the media coverage of this case was extensive. However, it is important to "[distinguish] largely factual publicity from that which is invidious or inflammatory." *Murphy v Florida*, 421 US 794, 801 n 4; 95 S Ct 2031; 44 L Ed 2d 589 (1975). Defendant failed to offer any specific evidence in the trial court—whether during trial or during the postconviction proceedings—showing that the media coverage of this case was anything other than nonsensational, factual coverage, or that the coverage was highly inflammatory or sensational in such a way as to prejudice him. *Unger*, 278 Mich App at 255; see also *Jendrzejewski*, 455 Mich at 501-509. Thus, defendant has failed to fulfill his burden. See *Unger*, 278 Mich App at 254 n 12; *Harvey*, 167 Mich App at 741-742.

Furthermore, defendant has failed to demonstrate that "community bias" could be implied in this case "from a high percentage of the venire who admit[ted] to a disqualifying prejudice." *Jendrzejewski*, 455 Mich at 501; see also *id*. at 511-515. Defendant mischaracterizes the record in his brief on appeal. Although some jurors acknowledged that they could not be impartial because of things that they had heard about this case (presumably from the media), numerous jurors were excused from Group A—and Group B—because they were unable to be fair and impartial for various reasons wholly unrelated to the pretrial publicity of the case or their knowledge of defendant. Our review of the record confirms that *at most* 25 out of 98 potential jurors were excused due to preconceived biases against defendant. Accordingly, the record does not support a finding of "community bias" based on the number of potential jurors who admitted to disqualifying prejudice as a result of the pretrial publicity in this case. See *Jendrzejewski*, 455 Mich at 511-515; see also *Murphy*, 421 US at 802-803; *People v DeLisle*, 202 Mich App 658, 669; 509 NW2d 885 (1993).

Several additional considerations are noteworthy, all of which show that defendant was not denied a fair trial based on the venue of this case. First, after a potential juror expressed an opinion against defendant, he or she was immediately dismissed for cause by the court. Both parties had an extensive opportunity to question prospective jurors and exercise preemptory challenges, and any remaining jurors who were exposed to media coverage of this case expressly confirmed that they could be fair and impartial, affirmatively committing to set aside any prior knowledge or opinions. In general, "where potential jurors can swear that they will put aside preexisting knowledge and opinions about the case, neither will be a ground for reversing a denial of a motion for a change of venue." *DeLisle*, 202 Mich App at 66; see also *Harvey*, 167 Mich App at 741, citing *Irvin v Dowd*, 366 US 717; 81 S Ct 1639; 6 L Ed 2d 751 (1961). As further discussed next in this opinion, the record shows that voir dire functioned exactly as it should have, exposing potential jurors' biases so that the trial court and attorneys could assess each juror's impartiality and ensure that the impaneled jury was fair and impartial. See *Jendrzejewski*, 455 Mich at 509-510, citing *Tyburski*, 445 Mich 606.

Lastly, even if there was "a barrage of inflammatory publicity leading to a pattern of deep and bitter prejudice against the defendant, or a carnival-like atmosphere surrounding the

proceedings," *Jendrzejewski*, 455 Mich at 506-507 (quotation marks and citations omitted), the record shows that this type of publicity likely existed in *all* venues. Defendant's case was the subject of both local and nationwide media coverage, as evidenced by defendant's participation in interviews on *Dateline* and *Good Morning America*. Because the media coverage of defendant's case was not limited to Wayne County or even southeastern Michigan, "moving the trial to another venue would not likely have eliminated or even substantially reduced the coverage," or any purported prejudice. *United States v Tsarnaev*, 157 F Supp 3d 57, 63 (D Mass, 2016); see also *id*. at 58, 60.

Considering the totality of the circumstances, *Jendrzejewski*, 455 Mich at 502, defendant has failed to establish a plain error affecting his substantial rights, see *Carines*, 460 Mich at 763-764.

## C. JURY SELECTION

Defendant contends that the jury selection procedures employed by the trial court in this case violated his right to a fair trial. The record does not support his claim.

"A defendant who chooses a jury trial has an absolute right to a fair and impartial jury." *Tyburski*, 445 Mich 606, 618, citing *Duncan v Louisiana*, 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491 (1968); see also *People v Miller*, 411 Mich 321, 326; 307 NW2d 335 (1981). To safeguard that right, courts are obliged to conduct voir dire in a manner that will elicit sufficient information to establish a rational basis for excluding potential jurors whose biases render them incapable of being fair and impartial. *Tyburski*, 445 Mich at 618. "In ensuring that voir dire effectively serves this function, the trial court has considerable discretion in both the scope and conduct of voir dire," *People v Sawyer*, 215 Mich App 183, 186-187; 545 NW2d 6 (1996), citing MCR 6.412(C), and *Tyburski*, 445 Mich at 619, and the court is not subject to "hard and fast rules" in orchestrating the voir dire. *Tyburski*, 445 Mich at 623. "In reviewing the trial court's conduct, this Court must determine whether the trial court conducted a voir dire 'sufficiently probing . . . to uncover potential juror bias.' " *Sawyer*, 215 Mich App at 187, quoting *Tyburski*, 445 Mich at 609.

Defendant claims that the jury selection procedures employed in this case were improper because "[t]he only effective way a jury could be selected in the present case in Wayne County would be by sequestered questioning of each potential juror." However, instead of mandating sequestered questioning in all cases "[w]here pretrial publicity creates the danger of prejudice," the Michigan Supreme Court has suggested three possible approaches. *Tyburski*, 445 Mich at 619, 623-624; see also *Jendrzejewski*, 455 Mich at 509. First, a trial court may "allow submission of a questionnaire to potential jurors, prepared by the parties and approved by the court," which may be used facilitate an in-depth examination of jurors' preconceived notions of the case. *Tyburski*, 445 Mich at 623-624. Second, a trial court can allow the trial attorneys to question prospective jurors during the voir dire. *Id*. at 624. Third, the court may "question individuals or small groups away from the remaining veniremen," allowing potential jurors to freely express their thoughts and beliefs without influencing other jurors. *Id*. Notably, the Court acknowledged that "there were positives and negatives to each method and did not find one superior to the other." *Jendrzejewski*, 455 Mich at 509. Again, the Court explained, "Individual sequestered voir dire [is] not necessarily required, as long as the method of questioning [is]

adequate to expose bias and to avoid taint." *Id*. at 626; see also *Jendrzejewski*, 455 Mich at 509.

On the first day of trial, the court expressly acknowledged the Michigan Supreme Court's opinion in *Tyburski* and held that it was going to utilize two of the three suggested procedures, i.e., (1) a juror questionnaire and (2) an opportunity for attorney questioning, to ensure that defendant's case was heard by a fair and impartial jury. The lower court record includes at least two versions of the questionnaire submitted by the defense. A review of the drafts in the lower court record and the court's discussion with the parties concerning the final questionnaire, it is apparent that the questionnaire asked highly probing questions regarding jurors' potential biases. Additionally, the trial transcripts confirm that the trial court and the attorneys from both parties extensively questioned the prospective jurors. Each of these methods alone was "sufficiently probing" "to elicit information concerning exposure to publicity" and provide the court with adequate information to determine which jurors were incapable of impartiality. See *Jendrzejewski*, 455 Mich at 509. Thus, it is clear that in this case, unlike in *Tyburski*, defendant's right to a fair trial was not violated given the trial court's use of two effective procedures. See *id*. at 510.

However, defendant contends that the jury selection process was unfair because the trial court should have used the questionnaires to identify potential jurors who possessed biases and subsequently sequestered those jurors during voir dire. According to defendant, because admittedly biased individuals were allowed to express their prejudices in front of other potential jurors, "the jury pool was tainted."

Defendant is correct that some jurors expressed hesitation regarding their ability to be impartial or stated outright that they were biased against defendant before they were excused by the trial court or excused following a preemptory challenge. A statement made by a prospective juror during voir dire may warrant a new trial if it is of such a nature " 'as to affect the impartiality of the jury or disqualify them from exercising the powers of reason and judgment.' " *People v Sowders*, 164 Mich App 36, 47; 417 NW2d 78 (1987), quoting *People v Nick*, 360 Mich 219, 230; 103 NW2d 435 (1960). However, there is no indication that the jury ultimately selected was affected by those comments or that those comments disqualified the selected jury from exercising reason and judgment. Again, the trial court went above and beyond what it was required to do even under *Tyburski* to ensure that defendant received a fair trial.

Furthermore, "[j]urors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Any possible prejudice that resulted from exposure to certain individuals' opinions or beliefs about the case was cured when the trial court (1) repeatedly emphasized during voir dire that defendant was presumed innocent until the prosecution proved beyond a reasonable doubt that he was guilty, (2) expressly instructed the jury as such, and (3) explained at length during the preliminary jury instructions that the jurors must decide the case solely based on the evidence presented in the courtroom and may not consider information from anywhere else, including the media. Thus, the record confirms that the trial court's instructions adequately addressed any potential prejudice.

Considering the procedures utilized by the trial court in this case, the court did not commit a plain error affecting defendant's substantial rights when it declined to sequester the

potential jurors during voir dire.  See *Carines*, 460 Mich at 763-764; *Sawyer*, 215 Mich App at 186-187.  Likewise, defendant has failed to establish that the jury selection procedures utilized by the trial court denied him a fair trial.  See *Carines*, 460 Mich at 763-764.[9]

## IV.  RIGHT TO PRESENT A DEFENSE

Next, defendant claims that a variety of circumstances violated his right to present a defense.  Defendant has failed to establish that his constitutional right to present a defense was violated, or that he is otherwise entitled to a new trial, based on any of the grounds raised here.

## A.  STANDARD OF REVIEW

Constitutional questions are generally reviewed de novo, including claims that a defendant was denied his right to present a defense, *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002), as well as due process claims, such as allegations of a *Brady* violation, *People v Stokes*, 312 Mich App 181, 189; 877 NW2d 752 (2015).  Likewise, we review de novo whether the prosecution's conduct violated a defendant's right to a fair and impartial trial.  *People v Fyda*, 288 Mich App 446, 460; 793 NW2d 712 (2010).  We review for clear error a trial court's factual findings on a motion for a new trial and review for an abuse of discretion the court's decision to grant or deny the motion.  *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008).  However, to the extent that these claims are unpreserved, our review is limited to plain error affecting substantial rights.  *Carines*, 460 Mich at 764-765; *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).

## B.  ANALYSIS

Defendant raises several claims under the umbrella of his constitutional right to present a defense.  As a general matter, "[t]here is no doubt that based on the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process or Confrontation Clauses, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  *People v King*, 297 Mich App 465, 473; 824 NW2d 258 (2012) (quotation marks and citations omitted).  Pursuant to their right to present a defense, criminal defendants, "at a minimum, . . . have the right to . . . put before a jury evidence that might influence the determination of guilt."  *People v Anstey*, 476 Mich 436, 460; 719 NW2d 579 (2006) (second alteration in original) (quotation marks and citations omitted).

However, defendant's claims under this issue are actually governed by several constitutional and nonconstitutional principles other than his constitutional right to present a defense.  We will address each of defendant's claims in turn, applying the proper standards applicable to the gravamen of each argument.

---

[9] Defendant's ineffective assistance of counsel claims concerning these issues must fail for the same reasons previously discussed.  See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010); see also *Unger*, 278 Mich App at 254-255.

## C. INVESTIGATOR FUNDING

Defendant first argues that "the defense team was hamstrung by the court's denial of full payment of necessary and reasonable investigative services." The record does not support defendant's claim.

A trial court's appointment of an investigator is reviewed for an abuse of discretion. *People v Johnson*, 245 Mich App 243, 260; 631 NW2d 1 (2001) (opinion by O'CONNELL, J.). A logical extension of this principle is that a trial court's limitation of an investigator's fees is a matter within the trial court's discretion. A defendant must "show that, under the facts and circumstances of the case, an investigator was necessary to afford him due process or that the trial court's ruling substantially prejudiced him." *Johnson*, 245 Mich App at 260, citing *Mason v Arizona*, 504 F2d 1345, 1352-1353 (CA 9, 1974), and *People v Blackburn*, 135 Mich App 509, 520-521; 354 NW2d 807 (1984). Likewise, defendant must demonstrate prejudice in order to establish a plain error affecting his substantial rights with regard to this claim. *Carines*, 460 Mich at 763.

It is important to note that the record shows that defendant received significantly more investigative assistance than an average defendant in preparation for trial. However, as defendant emphasizes on appeal, the trial court denied many of the fees requested by the investigators. Additionally, the investigators confirmed during the postconviction hearing that the likely prospect of not being compensated for services that they believed were necessary and reasonable, simply because the trial court did not believe that those services were necessary and reasonable, prompted the investigators to narrow the scope of their investigation and only provide services to the extent requested by defense counsel.

Even so, defendant has failed to demonstrate that the trial court's failure to provide additional funds for the investigators violated his right to present a defense, violated his right to due process, or substantially prejudiced him. See *Carines*, 460 Mich at 763; *Johnson*, 245 Mich App at 260. Both defense attorneys expressly confirmed that the investigators performed every task requested of them, and they specifically identified numerous jobs that the investigators had completed for the defense. Likewise, the investigators unequivocally testified that they fully completed, to the best of their abilities, virtually every request made by defense counsel. Furthermore, defense counsel was not even aware that the investigators had not received payment for their services until December 2014, after the case had ended, and they testified that they could not identify any task that the investigators had failed to perform because they were not getting paid. Accordingly, defendant's claim that "the defense team was hamstrung by the court's denial of full payment of necessary and reasonable investigative services" must fail.

Although both investigators believed that further investigation would have been beneficial to defendant—and one investigator felt that he was unable to pursue his theory regarding J.J. McKee's involvement in the case, and fully investigate the case in other ways, due to the trial court's limitation of funding—there is no evidence in the record demonstrating that these circumstances limited defendant's ability to present a defense or affected defendant's right to due process. See *Anstey*, 476 Mich at 460; *King*, 297 Mich App at 473; *Johnson*, 245 Mich App at 260. Except for the investigators' speculation, there is absolutely no evidence that McKee had any involvement in the murder, or that any further investigation would have actually

assisted defendant's case. Furthermore, defense counsel testified that they were able to leverage at trial the police's failure to investigate McKee and other aspects of the case, arguing that the failure to investigate resulted in reasonable doubt. Indeed, the record confirms that defense counsel relied heavily on this defense strategy at trial.

On this record, there is no indication that the trial court's failure to provide additional funds for defendants' private investigators violated defendant's due process rights or resulted in substantial prejudice. *Johnson*, 245 Mich App at 260.

### D. LACK OF WITNESS CONTACT INFORMATION

Defendant's next claim regarding the lack of "contact information for the 300 witnesses" also must fail. In his brief on appeal, defendant contends, "Without such information, there was no reasonable way for the Investigators to do their jobs in the amount of time provided." We disagree.

A defendant has no constitutional right to discovery in criminal cases. *People v Elston,* 462 Mich 751, 765; 614 NW2d 595 (2000). All discoverable materials, except exculpatory material, must be requested. MCR 6.201; *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). The only indication in the record that the defense requested witness contact information is the investigators' testimony that they asked defense counsel to obtain the witness contact information from the prosecution, but defense counsel told them that the prosecution would not turn over the contact information because all of the prosecution's witnesses were in fear. Accordingly, the record is not clear whether defense counsel expressly requested contact information from the prosecution as required by MCR 6.201. Additionally, there is no indication in the record that the defense requested that the prosecution make witnesses available for interview, which is the alternative specifically afforded under MCR 6.201(A)(1).

Furthermore, the court rule only requires the prosecution to provide contact information, or make available for interview, witnesses that it may call at trial. MCR 6.201(A). Defendant's claim on appeal is that his right to present a defense was violated by the prosecution's failure to provide the contact information for all 300 witnesses. Defendant was not entitled to contact information for all of those witnesses under MCR 6.201(A)(1). As demonstrated by the pretrial witness lists in the lower court file and the actual number of witnesses called to testify at trial (or whose testimony was entered by stipulation), the actual number of witnesses called by the prosecution was *much* less than the 300 witnesses mentioned in the discovery material.

Defendant also has failed to demonstrate the requisite prejudice. See *Carines*, 460 Mich at 763. The record shows, contrary to his claims, that the defense's inability, or failure, to interview many of the witnesses was not solely related to the prosecution's failure to provide the contact information, and that the defense easily could have obtained contact information for many of the witnesses. Additionally, defendant's brief on appeal also fails to identify any specific way in which he was prejudiced. Rather, his claim amounts to pure conjecture, as he contends, in essence, that he is entitled to a new trial because of information that may have been discovered if his investigators were provided the witness contact information. Accordingly, defendant has failed to establish a plain error affecting his substantial rights. See *Carines*, 460 Mich at 763.

## E. USE OF A LAPTOP DURING INCARCERATION

Based on the disjointed statements of defendant's claim, it appears that defendant contends that the trial court violated his right to present a complete defense by refusing to grant his request at the January 9, 2014 motion hearing to use a laptop during his incarceration so that he could "review the voluminous information" and "better read those documents due to an eye condition." As discussed, the defense was entitled to discovery from the prosecution upon request. MCR 6.201. Additionally, defense counsel had an ethical duty to keep defendant reasonably informed about the status of his case and was obligated to "comply promptly with reasonable requests for information." MRPC 1.4(a). However, defendant has identified no authority that he was entitled to personally possess and review some or all of the discovery materials outside the presence of his attorney during his incarceration, and we have found none. We reject defendant's claim, as he has failed to identify any legal basis for concluding that he was entitled to personally retain the voluminous documentation during his incarceration, much less that he was entitled to use a laptop to review the information.

Additionally, the trial court ensured that defendant had a magnifying device and other office supplies throughout the pretrial and trial proceedings to ensure that defendant was able to adequately prepare for trial and contribute to his defense. The trial court also expressly stated that special reading glasses would be provided to defendant if he needed them. Most importantly, the trial court provided the defense an extensive opportunity throughout the trial to cross-examine the prosecution's witnesses, present witnesses on defendant's behalf, and present lengthy closing arguments, all of which provided an ample opportunity to present a full defense on defendant's behalf. See *Anstey*, 476 Mich at 460; *King*, 297 Mich App at 473.

Defendant has failed to establish that the trial court's failure to provide him with a laptop inhibited his right to present a complete defense.[10]

## F. FAILURE TO SECURE JANE'S CLOTHING

Defendant claims that the police were "inexcusabl[y] negligen[t] in failing to secure Jane Bashara's clothing . . . ." Although he includes this claim under the broader issue alleging that his constitutional right to present a defense was violated, he appears to contend that this failure either constituted a *Brady* or a *Youngblood* violation, which infringed his due process right to evidence. See *Arizona v Youngblood*, 488 US 51; 109 S Ct 333; 102 L Ed 2d 281 (1988); *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

Under *Brady*, 373 US at 87, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See also *People v*

---

[10] To the extent that defendant briefly claims that he was not provided discovery material, this claim is abandoned, as he has provided no citation to the record in support of this claim and identified no supporting authority. *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001).

*Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014) (quoting *Brady*). To constitute a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Chenault*, 495 Mich at 149-150 (quotation marks and citation omitted). Stated differently, the elements of a *Brady* violation are as follows: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *Chenault*, 495 Mich at 155. Here, because Jane's clothing never was in the possession of the police or prosecution, it is impossible for defendant establish a *Brady* violation. See *People v Stanaway*, 446 Mich 643, 666; 521 NW2d 557 (1994).

In *Youngblood*, 488 US at 58, the Court held that the failure to preserve potentially useful evidence does not constitute a denial of due process unless the defendant shows that the police or prosecution acted in bad faith when they failed to preserve the evidence. See also *People v Heft*, 299 Mich App 69, 79; 829 NW2d 266 (2012); *Hanks*, 276 Mich App at 95. "To establish bad faith, then, a defendant must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.' " *United States v Jobson,* 102 F3d 214, 218 (CA 6, 1996), quoting *California v Trombetta*, 467 US 479, 488; 104 S Ct 2528; 81 L Ed 2d 413 (1984).

Defendant has provided no showing that Jane's clothing was actually or potentially exculpatory. He claims that "[h]ad the clothing been analyzed showing J.J. McKee's DNA (or any other person's DNA), it would have cleared Defendant." However, this claim is wholly unsupported by the record given the extensive circumstantial evidence indicating defendant's involvement in the murder in ways other than the actual performance of the killing. Notably, defendant's own statement in his brief on appeal confirms that the evidentiary value of Jane's clothing is unknown and the clothing was, at most, potentially useful evidence.

To establish that the police violated his right to the due process of law by "fail[ing] to preserve *potentially useful* evidence," defendant must demonstrate that the police acted in bad faith. *Youngblood*, 488 US at 58 (emphasis added); see also *Hanks,* 276 Mich App at 95. Here, there is absolutely no indication that the police acted in bad faith when they failed to retrieve Jane's clothing, given the trial testimony regarding the routine procedures of the medical examiner's office[11] and police officers' testimony regarding why they did not think to pick up Jane's clothing until after it had been released to the funeral home by the medical examiner's office. Thus, because defendant has not sustained his burden of showing that the evidence was exculpatory or that law enforcement personnel acted in bad faith in failing to preserve Jane's clothing, his claim must fail.

## G. LATE DISCLOSURE OF EVIDENCE

Defendant appears to argue that the police and prosecution's delay in obtaining the report analyzing the leaves found on Jane's sock and in the vehicle violated his rights because it

---

[11] It is noteworthy that a showing that "evidence was destroyed in the course of implementing routine procedures militates against a finding of bad faith." *United States v Garza*, 435 F3d 73, 76 (CA 1, 2006); see also *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992).

"denied the defense an opportunity to further research where these leaves were initially located." From what we can discern, defendant appears to contend that "research" in this regard may have supported additional defense theories, such as one involving the movement of Jane's body between vehicles before her body was abandoned on Annott Street. Defendant has failed to establish any basis for relief.

Defendant's claim that "the dilatory tactics of obtaining the report of the leaves found on Jane Bashara and in her vehicle denied the defense an opportunity to research where these leaves were initially located" does not logically follow from the findings of the report. The report itself was largely inconclusive. Accordingly, it is not clear that the findings of the report were necessarily favorable to defendant, *Chenault*, 495 Mich at 149-150, and it is very clear that the report was not material in this case, especially given the massive amount of other—and highly material—evidence admitted at trial. See *id*. at 150, 156 (explaining what constitutes material evidence). Additionally, if the defense believed that the leaves on Jane's sock came from somewhere other than the Basharas' garage, they could have investigated that matter further by researching leaves from other sources, regardless of the outcome of the report. Notably, the report only compared the fragments on Jane's sock to the Basharas' home, car, and garage. It did not examine leaves from any other location.

There is no indication that the timing of the disclosure of the report limited the defense's investigation in any way. Defendant has failed to establish that the prosecution's disclosure of the report constituted a *Brady* violation. See *id*. at 149-150, 155.

## H. FAILURE TO SEEK OR OBTAIN "KEY INFORMATION"

Defendant contends that the prosecution violated his right to present a defense by failing to fully investigate J.J. McKee. This claim has no merit.

Defendants have a due process right to obtain exculpatory information or evidence within the prosecutor's control that would "raise a reasonable doubt about the defendant's guilt." *Stanaway*, 446 Mich at 666, citing *Brady*, 373 US at 78, and *People v Carter*, 415 Mich 558, 593; 330 NW2d 314 (1982). The prosecution also has a duty *to the public* to adequately prepare each case. *People v Burwick*, 450 Mich 281, 289 n 10; 537 NW2d 813 (1995). However, the prosecution and the police do not have an affirmative duty to search for evidence to aid the defendant's case, *id*., to "secure discoverable information on behalf of defendant," *People v Bosca*, 310 Mich App 1, 29; 871 NW2d 307 (2015), app held in abeyance 872 NW2d 492 (2015), or to "assist a defendant in developing potentially exculpatory evidence," *Anstey*, 476 Mich at 461. Likewise, "[t]he prosecution is not required to seek and find exculpatory evidence or assist in building or supporting a defendant's case, nor is it required to negate every theory consistent with defendant's innocence." *Bosca*, 310 Mich App at 30 (quotation marks and citation omitted).

It is apparent from the testimony provided during defendant's trial and during the postconviction proceedings—including the testimony provided by law enforcement, defendant's counsel, and the appointed investigators—that the prosecution had no exculpatory information or evidence related to McKee that would have raised a reasonable doubt regarding defendant's guilt. See *Stanaway*, 446 Mich at 666. To the contrary, the record clearly shows that the

prosecution considered McKee to be a dead end.  Thus, the prosecution did not fail to fulfill any of its constitutional obligations, and it had no duty to further investigate McKee.[12]

## V.  COCONSPIRATOR STATEMENTS

Next, defendant argues that the trial court's admission of Gentz's statements under MRE 801(d)(2)(E) violated his right of confrontation.  He also briefly contends that the admission of these statements was improper under MRE 801(d)(2)(E) because they were not supported by independent evidence of a conspiracy.  We disagree.

## A.  STANDARD OF REVIEW

Whether the admission of evidence "violate[d] a defendant's Sixth Amendment right of confrontation is a question of constitutional law that this Court reviews de novo." *People v Nunley*, 491 Mich 686, 696-697; 821 NW2d 642 (2012); see also *People v Henry (After Remand)*, 305 Mich App 127, 152; 854 NW2d 114 (2014).  "[W]e review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014).  A trial court abuses its discretion when its decision on a particular matter "is outside the range of principled outcomes." *People v Terrell*, 289 Mich App 553, 559; 797 NW2d 684 (2010), overruled in part on other grounds by *People v Grissom*, 492 Mich 296 (2012).

## B.  ANALYSIS

The United States Constitution and the Michigan Constitution both afford a criminal defendant the right "to be confronted with the witnesses against him." *People v Fackelman*, 489 Mich 515, 524-525; 802 NW2d 552 (2011), quoting US Const, Am VI, and Const 1963, art 1, § 20.  MCL 763.1 also provides that a criminal defendant has the right to "meet the witnesses who are produced against him face to face."  Generally speaking, the Confrontation Clause bars the admission of a witness's testimonial statements if the witness does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v Washington*, 541 US 36, 59; 124 S Ct 1354; 158 L Ed 2d 177 (2004); *Bennett*, 290 Mich App at 481.

---

[12] Defendant also raises ineffective assistance of counsel claims related to each of the claims previously analyzed under this issue.  For the same reasons already discussed, these claims must fail, as "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *Ericksen*, 288 Mich App at 201.  The postconviction record also shows that defense counsel's failure to pursue these claims was a reasonable exercise of trial strategy, as they emphasized at trial many of the police and prosecution's failures in order to advance a defense theory that the state inadequately investigated this case and rushed to judgment.  Defendant has failed to demonstrate the requisite prejudice for these claims.  See *Vaughn*, 491 Mich at 669.

However, "the right of confrontation is concerned with a specific type of out-of-court statement, i.e., the statements of 'witnesses,' those people who bear testimony against a defendant." *Fackelman*, 489 Mich at 528, citing *Crawford*, 541 US at 51. The *Crawford* Court declined to "spell out a comprehensive definition of testimonial statements," *id*. at 68, but it defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact," *id*. at 51 (quotation marks and citation omitted; alteration in original). The Court also concluded that "testimonial statements" include, "at a minimum," "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." *Id*. at 68. Correspondingly, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id*. at 51. Accordingly, statements "made informally to an acquaintance"—and "not during a police interrogation or other formal proceeding, . . . or under circumstances indicating that their 'primary purpose' was to 'establish or prove past events potentially relevant to later criminal prosecution' "—are nontestimonial. *People v Taylor*, 482 Mich 368, 378; 759 NW2d 361 (2008), citing *Crawford*, 541 US at 68, and *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006).

All of Gentz's statements admitted by the trial court under MRE 801(d)(2)(E) were statements made to a friend or acquaintance, not statements made to the police, made during a formal proceeding, or made under any circumstances indicating that the purpose of the statements was to describe past events potentially relevant to a criminal prosecution. See *id*. Because none of Gentz's statements were "testimonial," their admission did not implicate the Confrontation Clause. See also *United States v Mooneyham*, 473 F3d 280, 286-287 (CA 6, 2007). Thus, we reject defendant's claim that the admission of Gentz's statements was improper on that basis.

Defendant's fleeting claim that there was insufficient independent evidence of a conspiracy also has no merit. See MRE 801(d)(2)(E); *People v Martin*, 271 Mich App 280, 316-317; 721 NW2d 815 (2006), aff'd 482 Mich 851 (2008). This issue is not properly before us because defendant did not raise this claim in his statement of the questions presented; his statement of the issue only contests the admission of Gentz's statements on Confrontation Clause grounds. See *Unger*, 278 Mich App at 262; see also MCR 7.212(C)(5). Regardless, as the trial court concluded, there was independent proof of the conspiracy, consisting, at a minimum, of phone records, evidence of financial payments, defendant's own statements to other individuals, and other circumstantial evidence concerning the development of defendant and Gentz's relationship. The trial court's admission of Gentz's statements under MRE 801(d)(2)(E) was not outside the range of principled outcomes. See *Terrell*, 289 Mich App at 559.

## VI. REASONABLE DOUBT INSTRUCTION

Defendant contends that the trial court's explanation of reasonable doubt in response to a jury question violated his due process rights. We disagree.

## A. STANDARD OF REVIEW

As an initial matter, defendant waived his right to appeal this instructional error when defense counsel expressly affirmed, after the court stated its explanation of reasonable doubt in

response to the jury's question, that they were satisfied with the court's "rendition." *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011); *Carter*, 462 Mich at 215. Even if this issue had not been waived, it is, at most, unpreserved. MCR 2.512(C); *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003), disapproved on other grounds 496 Mich 967 (2003); *People v Sabin*, 242 Mich App 656, 657; 620 NW2d 19 (2000). Unpreserved claims of instructional error are reviewed for plain error affecting substantial rights. *People v Jackson*, 313 Mich App 409, 421; 884 NW2d 297 (2015); see also *Sabin*, 242 Mich App at 657.

## B. ANALYSIS

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Rodriguez*, 463 Mich 466, 472; 620 NW2d 13 (2000) (quotation marks and citations omitted). "Jury instructions must clearly present the case and the applicable law to the jury. The instructions must include all elements of the charged offenses and any material issues, defenses, and theories if supported by the evidence." *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005) (citations omitted).

Jury instructions are to be read as a whole rather than extracted piecemeal to establish error. *Kowalski*, 489 Mich at 501; see also *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). "[A]n imperfect instruction is not grounds for setting aside a conviction if the instruction fairly presented the issues to be tried and adequately protected the defendant's rights." *Kowalski*, 489 Mich at 501-502. "To pass scrutiny, a reasonable doubt instruction, when read in its entirety, must leave no doubt in the mind of the reviewing court that the jury understood the burden that was placed upon the prosecutor and what constituted a reasonable doubt." *People v Hubbard (After Remand)*, 217 Mich App 459, 487; 552 NW2d 493 (1996), overruled in part on other grounds by *People v Harris*, 495 Mich 120 (2014), and *People v Bryant*, 491 Mich 575 (2012).

Contrary to defendant's unsupported claims, "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v Nebraska*, 511 US 1, 5; 114 S Ct 1239, 1243; 127 L Ed 2d 583 (1994). "[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id*. (citations omitted). Consistent with this Court's decision in *Hubbard*, 217 Mich App at 487, the United States Supreme Court has articulated the applicable standard as follows: "[T]aken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Victor*, 511 US at 5 (quotation marks and citation omitted; alterations in original).

Defendant fails to identify any specific way in which the trial court's explanation was improper, merely arguing "[t]he example given by the court was an erroneous definition/example of reasonable doubt," and that "the trial court should have merely re-read the reasonable doubt instruction of M Crim JI 3.2." In reviewing the trial court's instructions and explanation in its entirety, it is apparent that the court fairly and fully presented the issues to be tried and sufficiently protected defendant's rights, especially given the court's repeated reiterations of M Crim JI 3.2, the course of action advocated by defendant on appeal. See, e.g., *Kowalski*, 489 Mich at 501-502. The former version of the standard jury instruction, CJI2d 3.2, which was

virtually identical to M Crim JI 3.2, "has repeatedly been held to adequately convey the concepts of reasonable doubt, the presumption of innocence, and the burden of proof." *People v Hill*, 257 Mich App 126, 152; 667 NW2d 78 (2003). Additionally, as in *Hubbard*, 217 Mich App at 488, the instructions given, "[t]aken as a whole, . . . conveyed to the jury that a reasonable doubt is an honest belief based upon reason." Furthermore, the court's explanation by no means had the effect of shifting or lowering the burden of proof or otherwise altering or obscuring the definition of "reasonable doubt" set forth in the model jury instructions. See *Victor*, 511 US at 22-23; *Hubbard*, 217 Mich App at 488. Defendant has failed to establish that the trial court's explanation constituted a plain error affecting his substantial rights.

Defendant also contends that the trial court's explanation constituted an improper extrinsic influence on the jury. See *People v Budzyn*, 456 Mich 77, 88-89; 566 NW2d 229 (1997). This claim has no merit. This Court has recognized that extrinsic influences are limited to matters that are outside the trial proceedings and the jury's deliberative process. See *Fletcher*, 260 Mich App at 540-541. As such, "[a]ny conduct, even if misguided, that is inherent in the deliberative process is not subject to challenge or review." *Id.* at 540. Because defendant's claim concerning the trial court's instructions "relates to influences internal to the trial proceedings," *id.* at 539, the trial court's jury instruction in this case simply did not constitute an extrinsic influence on the jury.[13]

## VII. NEWLY DISCOVERED EVIDENCE

Defendant argues that the trial court abused its discretion when it denied his motion for a new trial on the basis of newly discovered evidence, i.e., a postconviction affidavit signed by Gentz, which described the way in which he committed the murder and indicated that defendant had no involvement in the crime. We disagree.

### A. STANDARD OF REVIEW

> We review for an abuse of discretion a trial court's decision to grant or deny a new trial. . . . Underlying questions of law are reviewed de novo, while a trial court's factual findings are reviewed for clear error. A trial court may grant a new trial to a criminal defendant on the basis of any ground that would support reversal on appeal or because it believes that the verdict has resulted in a miscarriage of justice. [*Terrell*, 289 Mich App at 558-559 (quotation marks and citations omitted).]

See also *People v Grissom*, 492 Mich 296, 312; 821 NW2d 50 (2012).

### B. ANALYSIS

---

[13] For the same reasons previously discussed, defense counsel did not provide ineffective assistance when they failed to object to the trial court's reasonable doubt instruction because any objection would have been futile. *Ericksen*, 288 Mich App at 201.

A new trial may be granted when the substantial rights of a party were materially affected and there was "[m]aterial evidence, newly discovered, which could not with reasonable diligence have been discovered and produced at trial." MCR 2.611(A)(1)(f). For a new trial to be granted on the basis of newly discovered evidence, a defendant must demonstrate that "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *Grissom*, 492 Mich at 313 (quotation marks omitted), quoting *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (quotation marks and citations omitted). "It is . . . well established that 'motions for a new trial on the ground of newly-discovered evidence are looked upon with disfavor, and the cases where this court has held that there was an abuse of discretion in denying a motion based on such grounds are few and far between.' " *Rao*, 491 Mich at 279-280, quoting *Webert v Maser*, 247 Mich 245, 246; 225 NW 635 (1929).

There is no basis in the record to conclude that the trial court clearly erred in crediting Gentz's postconviction testimony, or that it abused its discretion when it concluded that the affidavit did not constitute exculpatory evidence making a different result likely on retrial given his testimony. See *Terrell*, 289 Mich App at 558-559. When a motion for a new trial is predicated on the affidavit of a recanting witness, the trial court may ascertain the witness's credibility based on the witness's testimony at the original trial or at a hearing on the motion for a new trial. See MCR 2.611(D)(3); *People v Blair*, 44 Mich App 469, 471; 205 NW2d 183 (1973). A trial court may credit a recanting witness's original testimony should it conclude that the recantation testimony lacks credibility. *People v Canter*, 197 Mich App 550, 560-561; 496 NW2d 336 (1992).

Analogously, in this case, the trial court weighed Gentz's and defendant's credibility at the postconviction hearing, concluding that Gentz's oral testimony at the hearing was credible and that the statements in his affidavit—which were akin to recantation testimony given their direct contradiction of his statements in furtherance of the conspiracy admitted at trial—lacked credibility. A trial court has the discretion to evaluate the credibility of a witness in deciding a motion for a new trial. *Cress*, 468 Mich at 692; *Canter*, 197 Mich App at 560. And when reviewing a trial court's findings, this Court must recognize the trial court's superior ability to judge the credibility of the witnesses appearing it. MCR 2.613(C); *People v Tyner*, 497 Mich 1001; 861 NW2d 622 (2015); *Canter*, 197 Mich App at 560. There is significant evidence in the record supporting the trial court's credibility determinations in this case, and the trial court's findings of fact were not clearly erroneous, as all of them have ample support in the postconviction hearing testimony, given the trial court's credibility determinations. See *Canter*, 197 Mich App at 560. Contrary to defendant's claims, Gentz's postconviction testimony was not "irreconcilable with the facts of the case," and the trial court's factual findings based on his testimony were not clearly erroneous when considered in conjunction with the evidence presented at trial. Furthermore, the trial court's conclusion that Gentz's affidavit would not make a different result probable on retrial appears particularly reasonable given the fact that Gentz's statements in the affidavit did not undermine the overwhelming circumstantial evidence presented at trial indicating that defendant conspired with Gentz and aided and abetted Jane's murder. For all of these reasons, the trial court did not abuse its discretion when it denied defendant's motion for a new trial. See also *Cress*, 468 Mich at 692-695; *Terrell*, 289 Mich App at 558-559.

Lastly, defendant contends that the trial court "shut down" defense counsel's attempts to rehabilitate the affidavit and impeach Gentz's testimony at the postconviction hearing. Contrary to defendant's claims on appeal, the trial court provided an extensive opportunity for defendant's appellate counsel to cross-examine Gentz and show that the contents of the affidavit were true. Despite the attempts of defendant's counsel, Gentz consistently stated that the affidavit was false and that he did not read the affidavit before signing it. The trial court did limit defense counsel's cross-examination of Gentz in order to ensure that the focus of the evidentiary hearing remained on the affidavit and whether it made a different result probable on retrial, but there is no indication that the trial court's limitations inhibited defendant's ability to fully present his claim that the affidavit constituted newly discovered evidence entitling him to a new trial.

## VIII. FALSE EVIDENCE

Next, defendant argues that the prosecution violated his right to a fair trial by introducing into evidence the gun that Nancy Bashara found in a safety deposit box, as the firearm constituted false evidence and misled the jury. Defendant has failed to demonstrate that he is entitled to relief.

### A. STANDARD OF REVIEW

"Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). Here, "[b]ecause the alleged error was not preserved by a contemporaneous objection and a request for a curative instruction, appellate review is for plain (outcome-determinative) error." *Id.*; see also *Bennett*, 290 Mich App at 475-476. To the extent that this claim necessarily encompasses a constitutional due process claim, review is also for plain error affecting substantial rights. *Carines*, 460 Mich at 763-765.

### B. ANALYSIS

Broadly speaking, "[t]he test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *Brown*, 279 Mich App at 134. "The defendant bears the burden of demonstrating that such an error resulted in a miscarriage of justice." *Id.* See also *Elston*, 462 Mich at 762 (stating that an appellant bears the burden of demonstrating the factual basis for appellate claims).

"A prosecutor's good-faith effort to admit evidence does not constitute misconduct." *People v Dobek*, 274 Mich App 58, 70; 732 NW2d 546 (2007). However, a prosecutor may not deliberately or knowingly use false evidence or testimony to obtain a conviction. *Banks v Dretke*, 540 US 668, 694; 124 S Ct 1256; 157 L Ed 2d 1166 (2004); *People v Smith*, 498 Mich 466, 475-476; 870 NW2d 299 (2015); *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009). Likewise, a prosecutor has a duty to correct false evidence. *People v Gratsch*, 299 Mich App 604, 619-620; 831 NW2d 462 (2013), vacated in part on other grounds 495 Mich 876 (2013); see also *Smith*, 498 Mich App at 476. A prosecutor's knowing use of false evidence, or failure to correct false evidence, violates a defendant's right to due process. *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959); *Gratsch*, 299 Mich App at 619.

-24-

[A] conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment. Thus, it is the misconduct's effect on the trial, not the blameworthiness of the prosecutor, [which] is the crucial inquiry for due process purposes. The entire focus of our analysis must be on the fairness of the trial, not on the prosecutor's or the court's culpability. [*Aceval*, 282 Mich App at 389-390 (quotation marks and citations omitted).]

However, if a defendant fails to demonstrate that the evidence proffered by the prosecution was actually false, he fails to meet his burden of demonstrating a due process violation. See *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016).

Defendant has failed to meet his burden of demonstrating that the prosecutor deliberately or intentionally presented false evidence at trial. First, defendant has failed to definitively show that the gun presented at trial constituted "false evidence" because it was an antique revolver and not an automatic weapon. In support of this claim, defendant relies on transcripts of Gentz's interviews with the police. However, for the reasons previously discussed, we should not consider the exhibits attached to defendant's motion to remand, as they constitute an improper expansion of the record on appeal. See MCR 7.210(A)(1); *Gingrich*, 307 Mich App at 659 n 1; *Horn*, 279 Mich App at 38; *Maiden*, 461 Mich at 127 n 9.

Regardless, even if we were to consider Gentz's statements describing the gun used in the commission of the crime as an automatic, the mere fact that Gentz stated that he heard defendant insert the clip into the gun, and that the gun used by defendant during the incident was an automatic weapon, does not definitively demonstrate—or even strongly suggest—that the prosecution knowingly presented false evidence to the jury. Notably, Gentz expressly stated that he did not see the gun; he only heard the "click." Analogously, "[a]lthough an inconsistent prior statement may be a mechanism to impeach a witnesses' credibility at trial, it is not definitive evidence that the trial testimony is false." *Bass*, 317 Mich App at 275; see also *People v Lester*, 232 Mich App 262, 278-279; 591 NW2d 267 (1998), overruled in part on other grounds by *Chenault*, 495 Mich 142. Likewise, conflicts in a sworn statement are insufficient to meet the burden of establishing perjury. *People v Kozyra*, 219 Mich App 422, 429; 556 NW2d 512 (1996). Gentz may have been mistaken, and his statements by no means conclusively establish the specific gun allegedly used by defendant during the offense, especially given his stated inability to remember the type of gun at the postconviction hearing.

Even more significantly, (1) the circumstances surrounding Nancy's discovery of the gun after defendant asked her to put the bag of items into the safety deposit box and (2) defendant's repeated statements to friends, relatives, and the media after the murder that he never owned any weapon except a BB gun strongly support an inference that the gun was related to the crime, or, at a minimum, that defendant used *a* weapon during the crime and wanted to disassociate himself from the possession of any weapon. The fact that defendant asked Nancy to put a bag of items that included a gun into a safety deposit box strongly suggests a consciousness of guilt, especially considering his repeated denials, in public and private settings, that he ever owned a gun. See *Kowalski*, 489 Mich at 508-509; *Unger*, 278 Mich App at 226; *People v Hooper*, 50 Mich App 186, 199; 212 NW2d 786 (1973). It also supported the prosecution's theory of obstruction of justice. See *People v Thomas*, 438 Mich 448, 455; 475 NW2d 288 (1991). In

sum, the record includes no basis for concluding that the prosecution knowingly presented false evidence solely because Gentz's statements to the police were inconsistent with the gun discovered by Nancy and admitted at trial. Cf. *People v Herndon*, 246 Mich App 371, 417-418; 633 NW2d 376 (2001) (noting the prosecutor's reasonable explanation for introducing evidence); *Lester*, 232 Mich App at 278-279, overruled in part on other grounds by *Chenault*, 495 Mich 142.

Lastly, overwhelming evidence was presented at trial showing that defendant conspired with Gentz and aided and abetted the murder, regardless of whether he was physically present in the garage with a gun when Gentz committed the homicide. Accordingly, defendant is not entitled to a new trial, even if the prosecutor knowingly admitted false evidence in admitting the gun in this case, because the admission of the firearm did not "materially affect[] the trial's outcome" given the overwhelming evidence again him. *Gratsch*, 299 Mich App at 620 (alteration in original).[14]

## IX. ADDITIONAL TRIAL COURT ERRORS

Next, in his Standard 4 brief, defendant contends that the trial court erred (1) by admitting evidence regarding his involvement in the BDSM lifestyle that violated MRE 404(b) and (2) by coercing Gentz into testifying against his affidavit, thereby violating defendant's confrontation rights. We disagree.

### A. MRE 404(b)

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Relevant other-acts evidence is admissible unless the proponent's sole theory of relevance is "that the other act shows defendant's inclination to wrongdoing in general to prove that the defendant committed the conduct in question . . . ." *People v VanderVliet*, 444 Mich 52, 62-63; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). In *People v Smith*, 282 Mich App 191; 772 NW2d 428 (2009), this Court explained:

---

[14] Defendant also contends that defense counsel was ineffective when they failed to object to the admission of the antique revolver on the basis of prosecutorial misconduct. Again, because there was no evidence in the record that the prosecution intentionally or deliberately admitted false evidence, any objection would have been futile. *Ericksen*, 288 Mich App 192.

In deciding whether to admit evidence of other bad acts [in accordance with MRE 404(b)], a trial court must decide: first, whether the evidence is being offered for a proper purpose, not to show the defendant's propensity to act in conformance with a given character trait; second, whether the evidence is relevant to an issue of fact of consequence at trial; third, [under MRE 403,] whether its probative value is substantially outweighed by the danger of unfair prejudice in light of the availability of other means of proof; and fourth, whether a cautionary instruction is appropriate. [*Smith*, 282 Mich App at 194, citing *Sabin (After Remand)*, 463 Mich at 55-56, and *VanderVliet*, 444 Mich at 74-75.]

As an initial matter, it is important to note, as the prosecution argues on appeal, that many of the references at trial to BDSM and defendant's involvement in that lifestyle did not constitute other-acts evidence admitted under MRE 404(b). Instead, many of the references to defendant's involvement in the BDSM lifestyle occurred as a necessary result of providing context for (1) witnesses' familiarity with defendant and (2) witnesses' knowledge of defendant's conduct and statements relevant to the underlying issues trial. Accordingly, many of these references to defendant's involvement in the BDSM lifestyle did not implicate MRE 404(b) because they were outside the scope of that rule. See MRE 404(b)(1). Cf. *People v Sholl*, 453 Mich 730, 741-742; 556 NW2d 851 (1996).

Defendant, however, contests the admission of the lifestyle-related evidence on the basis that it was irrelevant. See MRE 401; *Smith*, 282 Mich App at 194; *Aldrich*, 246 Mich App at 114 (defining relevance). Contrary to defendant's claims, the record fully supports the prosecution's argument in their brief on appeal that "defendant's participation in BDSM activities [was] relevant to his motives in soliciting, conspiring, and assisting in the murder of Jane Bashara. Part of the prosecution's theory of the case was that defendant had a motive to have his wife killed so he could have the finances and freedom to start a life with his 'slaves.' " Notably, "[p]roof of motive in a prosecution for murder, although not essential, is always relevant, and evidence of other acts to prove motive is admissible under MRE 404(b)(1)." *People v Rice (On Remand)*, 235 Mich App 429, 440; 597 NW2d 843 (1999) (citation omitted). Further, "[i]n cases in which the proofs are circumstantial, evidence of motive is particularly relevant." *Unger*, 278 Mich App at 223. Here, defendant's motive was highly relevant in this case given his denial of any involvement in Jane's death. Our review of the record confirms that the BDSM-related evidence was admitted for a proper purpose and was very relevant to defendant's motive, a factual issue of significant consequence at trial. See *Smith*, 282 Mich App at 194.

Defendant also contends that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. See *id*. We disagree. For the reasons previously discussed, defendant's involvement in the BDSM lifestyle had significant probative value in this case. Although the lifestyle-related evidence was prejudicial, just as all evidence is prejudicial to a certain degree, there is no indication that the significant probative value of this evidence was outweighed by *unfair* prejudice. See *McGhee*, 268 Mich App at 613-614 (explaining unfair prejudice).

## B. COURT'S STATEMENTS BEFORE GENTZ'S POSTCONVICTION TESTIMONY

Defendant contends that Gentz testified contrary to his affidavit at the postconviction

hearing solely because of "threats and coercion" by the trial court. We disagree.

Because defendant did not object to the trial court's comments to Gentz, the propriety of the comments is reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763; see also *People v Paquette*, 214 Mich App 336, 340; 543 NW2d 342 (1995). In reviewing claims of error concerning a trial court's conduct, we examine the record as a whole and evaluate the alleged wrongful acts in context. *Paquette*, 214 Mich App at 340; see also *People v Callington*, 123 Mich App 301, 305; 333 NW2d 260 (1983).

As defendant emphasizes, a trial court is not permitted to admonish a witness in a manner that effectively drives the witness off the stand and thereby deprives a party of his or her due process rights. *Webb v Texas*, 409 US 95, 95-98; 93 S Ct 351; 34 L Ed 2d 330 (1972); see also *People v Lopez*, 316 Mich App 704, 714-719; 892 NW2d 493 (2016) (discussing *Webb* and cases involving similar conduct by a prosecutor). However, contrary to defendant's claims, the record clearly reveals that this case is factually distinguishable from *Webb*, *Lopez*, and similar cases. As this Court noted in *People v Robbins*, 131 Mich App 429, 439; 346 NW2d 333 (1984), "where the extraordinary circumstances on which the *Webb* decision was based were not present, warnings to potential defense witnesses concerning self-incrimination or possible perjury charges have been held to be proper."

Most importantly in this case, it is apparent that the trial court did not intimidate Gentz into declining to testify because Gentz still chose to testify following the trial court's statements. Compare *Webb*, 409 US at 95-98; *Lopez*, 316 Mich App at 719-725. Furthermore, the record belies defendant's claim that Gentz testified contrary to the affidavit solely because of the trial court's statements. Notably, the discussion on the record regarding Gentz's wish to renegotiate his plea for a lesser sentence in exchange for withdrawing the affidavit is wholly consistent with his in-court explanation for why he signed the affidavit in the first place, i.e., he was upset with the police and prosecution and wanted a new deal. There is absolutely no indication that the trial court's statements intimidated or coerced Gentz into testifying contrary to the affidavit.

Additionally, the trial court did not unexpectedly single out Gentz from other witnesses or threaten Gentz in the manner at issue in *Webb*, 409 US at 95-97. It is apparent that Gentz's own preferences and conduct, as expressed by his attorney, and the nature of his affidavit— which was contrary to his previous statements to others and the police—were the factors that prompted the trial court's extensive statements and warnings on the record. Cf. *Robbins*, 131 Mich App at 439-440. Likewise, it is clear that the trial court was not attempting, on its own initiative, to coerce or threaten Gentz in a manner that would discourage him from taking the stand, or to discourage him from providing testimony consistent with the affidavit. Rather, as the trial court expressly stated on the record, the rationale behind the trial court's statements was that it wanted "[Gentz] to understand the full implication of what [he was] doing," given Gentz's previous testimony and subsequent, contradictory affidavit. The record supports the trial court's concern in that regard, especially given Gentz's previous ambivalence in deciding whether he intended to withdraw his plea and whether he intended to testify at defendant's trial.

Moreover, the trial court's discussions with Gentz regarding his decision to testify spanned two hearings, in between which the trial court provided an opportunity for Gentz to consult with his attorney, consider his previous statements, and consult with his brother in light

of his cognitive difficulties and lack of education. Gentz consistently stated that he wanted to testify after each of these conversations with others outside the presence of the trial court. Cf. *Robbins*, 131 Mich App at 439-440. Accordingly, the record clearly shows that the trial court went out of its way to ensure that Gentz's decision was fully informed, voluntary, and not coerced. Defendant has failed to establish a plain error affecting his substantial rights. See *Carines*, 460 Mich at 763-765.

In addition, defendant's right of confrontation was not violated by the trial court. As the prosecution emphasizes on appeal, several courts have recognized that the right to confrontation is a "trial right," see *Pennsylvania v Ritchie*, 480 US 39, 52; 107 S Ct 989; 94 L Ed 2d 40 (1987), citing *California v Green*, 399 US 149, 157; 90 S Ct 1930; 26 L Ed 2d 489 (1970), and *Barber v Page*, 390 US 719, 725; 88 S Ct 1318; 20 L Ed 2d 255 (1968), which does not apply to proceedings that are not a part of the jury trial, such as postconviction motions for a new trial, see *Penton v Kernan,* 528 F Supp 2d 1020, 1036-1037 (SD Cal, 2007); *Stevens v Maloney*, 32 F Supp 2d 478, 482-483 (D Mass, 1998). Regardless, there is no indication that the trial court violated defendant's right of confrontation, even if it existed at the postconviction hearing, given the fact that Gentz actually testified and defendant's appellate counsel had an extensive opportunity to cross-examine him regarding the circumstances surrounding the affidavit. See *Ritchie*, 480 US at 53.

Likewise, to the extent defendant claims that the trial court improperly limited his counsel's examination of Gentz, we disagree. Defendant mischaracterizes the record and fails to acknowledge that the trial court gave defense counsel an *extensive* opportunity to explore the inconsistencies between Gentz's testimony at the post-conviction hearing and the facts stated in the affidavit and rehabilitate the account of the murder stated in the affidavit. Nevertheless, Gentz consistently maintained that the affidavit was "garbage."

## X. ADDITIONAL CLAIMS AGAINST THE PROSECUTION

Defendant also claims in his Standard 4 brief that the prosecution committed several instances of misconduct that violated his right to a fair trial. We disagree.

### A. STANDARD OF REVIEW

Each of defendant's unpreserved claims under this issue is reviewed for plain error affecting substantial rights. See *Carines*, 460 Mich at 763-764; *Steanhouse*, 313 Mich App at 15; *Bennett*, 290 Mich App at 475-476; *Cox*, 268 Mich App at 448; *Callon*, 256 Mich App at 329.

### B. FAILURE TO OBTAIN SURVEILLANCE FOOTAGE

Defendant first contends that the prosecution committed misconduct and a *Brady* violation when it failed to obtain video surveillance recordings from the McDonald's restaurant, where Gentz went on the night of Jane's death, and from Dylan's Bar. Defendant has failed to demonstrate that he is entitled to relief.

It appears that defendant's claim is focused on the fact that the police did not obtain footage from the outside of the McDonald's restaurant and did not obtain video footage from

Dylan's Bar. Similar to the police's failure to obtain Jane's clothing, defendant cannot establish a *Brady* violation on these grounds because there is no evidence that surveillance coverage from the outside of the McDonald's restaurant or from Dylan's Bar was ever in the possession of the police or the prosecution. See *Chenault*, 495 Mich at 155; *Stanaway*, 446 Mich at 666. Thus, defendant has failed to establish a *Brady* violation.

In the alternative, however, defendant asserts that the police and prosecution destroyed potentially useful evidence, in violation of *Youngblood*, 488 US at 58, by failing to preserve the video footage. This claim must fail because defendant has failed to demonstrate—or even allege—that the police or prosecution acted in bad faith. *Youngblood*, 488 US at 58; *Heft*, 299 Mich App at 79. The Detroit Police sergeant who was tasked with obtaining video surveillance footage from the McDonald's restaurant was instructed to extract footage from specific camera angles. He did not retrieve surveillance footage from the outside of the restaurant because he was not instructed to do so. And Captain Loch of the Grosse Pointe Park Police Department testified at trial that the police were unable to obtain surveillance tapes from Dillon's Restaurant[15] one week after Jane's body was found because the machine did not keep the recordings for that long.

Further, defendant has not shown how the video surveillance footage may have exonerated him. See *Youngblood*, 488 US at 58; *Heft*, 299 Mich App at 79. Defendant states that "[t]here was intense speculation by the prosecution and trial court as to when and where Joseph Gentz and Mr. Bashara were located during the commission of the crime, after, and with whom," and he argues that the surveillance footage "would have accurately placed Mr. Bashara and Joseph Gentz, and potentially have shown the presence of unobtained [sic] witness, JJ McKee, who allegedly was with Joseph Gentz the night of the murder." Even if defendant had supported this reasoning with evidence, defendant's argument does not provide any basis for concluding that the video surveillance evidence had the potential of exonerating defendant given the elements of his charges. Lastly, as previously discussed, "[t]he prosecution is not required to seek and find exculpatory evidence or assist in building or supporting a defendant's case, nor is it required to negate every theory consistent with defendant's innocence." *Bosca*, 310 Mich App at 30 (quotation marks and citation omitted).

Defendant has failed to demonstrate a plain error affecting his substantial rights. See *Carines*, 460 Mich at 763-764.

## C. PURPORTED ATTACK ON DEFENDANT'S CHARACTER

Next, defendant argues that the prosecution improperly attacked defendant's character by eliciting the testimony from Charles Gable stating the "four-way test" utilized by the Rotary and confirming that the test was "something the Rotary expects its members to look up to," "[i]ncluding its presidents."

---

[15] We assume that "Dylan's Bar" and "Dillon's Restaurant" are the same location and that the spelling difference is due to the spelling used by the stenographer transcribing the trial.

Because defendant has failed to offer any authority or reasoning in support of his claim, defendant has abandoned this issue. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Regardless, defendant has failed to establish that the prosecution's elicitation of this testimony constituted a plain error affecting his substantial rights. See *Callon*, 256 Mich App at 329. "A prosecutor's good-faith effort to admit evidence does not constitute misconduct," and there is no indication here that the prosecution attempted, in bad faith, to present inadmissible evidence. *Dobek*, 274 Mich App at 70. Further, even if we were to assume, solely for the sake of argument, that the prosecution intended this testimony to be an improper character attack, the testimony was very isolated and short in duration. Considered in relation to the thousands of pages of testimony admitted during the nine-plus weeks of trial—most of which inculpated defendant—there is absolutely no basis for concluding that this brief exchange concerning the expectations of Rotary members affected the outcome of the trial. See *Carines*, 460 Mich at 763. Defendant has failed to establish the requisite prejudice.

## D. FAILURE TO VACATE GENTZ'S PLEA AGREEMENT

Next, defendant argues that the prosecution committed prosecutorial misconduct when it failed to vacate Gentz's plea agreement after Gentz's invoked his Fifth Amendment right to remain silent and, as a result, failed to testify at defendant's trial in accordance with the agreement. Defendant again has failed to demonstrate a plain error affecting his substantial rights.

As defendant recognizes, plea agreements are governed by MCR 6.310 in Michigan.[16] The only subsection that pertains to the prosecution's withdrawal of a plea is MCR 6.310(E), which provides, "On the prosecutor's motion, the court may vacate a plea if the defendant has failed to comply with the terms of a plea agreement." The court rule includes no requirement that the prosecution *must* vacate a defendant's plea if he or she violates the terms of the agreement. Likewise, even though Michigan caselaw considering the current and former version of the court rule confirms that the prosecution has a recognized right to withdraw from a plea agreement under some circumstances, see, e.g., *People v Siebert*, 450 Mich 500, 510-511; 537 NW2d 891 (1995); *Martinez*, 307 Mich App at 650-651; *People v Siebert*, 201 Mich App 402, 413; 507 NW2d 211 (1993), aff'd 450 Mich 500 (1995), we have not found any Michigan caselaw holding that the prosecution *is required* to withdraw from or vacate a plea agreement under any circumstances.

Defendant also fails to recognize that the prosecution did not have the authority to vacate Gentz's plea without court approval. Rather, the prosecution's ability to vacate Gentz's plea was subject to the discretion of the trial court. See MCR 6.310(E); *Martinez*, 307 Mich App at 646, 649; *People v Strong*, 213 Mich App 107, 110-112; 539 NW2d 736 (1995). Accordingly, it would defy reason to conclude that a prosecutor's failure to vacate Gentz's plea could constitute prosecutorial misconduct.

---

[16] However, some situations may arise that are outside the scope of the court rules. *People v Martinez*, 307 Mich App 641, 650-651; 861 NW2d 905 (2014).

Lastly, a significant aspect of defendant's claim is that the prosecution's failure to file a motion to vacate the plea in Gentz's case violated defendant's right of confrontation because vacating Gentz's plea would have resulted in Gentz's testifying in defendant's case. Defendant has identified no factual basis for this reasoning, and contrary to defendant's conclusory statements, it appears highly unlikely that Gentz would have stopped asserting his Fifth Amendment right to remain silent even if the prosecution had vacated the plea agreement. See MCR 6.312; MRE 804(a)(1); *People v Meredith*, 459 Mich 62, 66; 586 NW2d 538 (1998). Gentz's unavailability, on its own, also did not violate defendant's right of confrontation. The confrontation clause ensures that "*evidence admitted against an accused* is reliable and subject to the rigorous adversarial testing." See *Maryland v Craig*, 497 US 836, 846; 110 S Ct 3157, 3163; 111 L Ed 2d 666 (1990) (emphasis added). Defendant's right of confrontation is not a means by which defendant may require the elicitation of *additional* testimony from an unavailable witness. Compare *Crawford*, 541 US at 59; *Bennett*, 290 Mich App at 481.

## E. FAILURE TO PRESENT MCKEE AS A RES GESTAE WITNESS

Defendant contends that the prosecution committed misconduct when it "fail[ed] to obtain JJ McKee as [a] res gestae witness." We disagree.

A res gestae witness is " 'one who is present at the scene of the alleged crime, at the time of the alleged crime, or one who had occasion to observe the surrounding events and circumstances.' " *Steanhouse*, 313 Mich App at 15, quoting *People v Dyer*, 425 Mich 572, 577 n 4; 390 NW2d 645 (1986). It is overwhelmingly apparent from our review of the entire record that there is no basis for concluding that the prosecution should have identified McKee as a res gestae witness.

Furthermore, defendant relies on outdated law and fails to recognize that, following the enaction of MCL 767.40a, the prosecution no longer has an affirmative duty to present the "entire res gestae," or to call at trial all of the witnesses who were present when a crime occurred. *People v Koonce*, 466 Mich 515, 518-519; 648 NW2d 153 (2002). Under MCL 767.40a, as amended, "the prosecutor has a duty to attach to the information a list of all witnesses the prosecutor might call at trial and of all known res gestae witnesses, to update the list as additional witnesses bec[o]me known, and to provide to the defendant a list of witnesses the prosecution intend[s] to call at trial." *Koonce*, 466 Mich at 520-521, citing MCL 767.40a(1), (2), and (3). The prosecutor is also "compelled to render reasonable assistance in locating and serving process upon witnesses upon request of the defendant." *Koonce*, 466 Mich at 521, citing MCL 767.40a(5). Thus, even if McKee was a res gestae witness, defendant is incorrect that the prosecution had a duty to *produce* him as a prosecution witness. Furthermore, based on defense counsel's testimony at the *Ginther* hearing, there is no indication that the defense requested assistance in producing McKee at trial. See *id*.

Defendant has failed to establish a plain error affecting his substantial rights.

## XI. SUFFICIENCY OF THE EVIDENCE/CUMULATIVE ERROR

Finally, in his Standard 4 brief, defendant contends that the prosecution presented insufficient evidence to support his convictions. However, the substance of this claim is a cumulative error argument. Regardless, we reject defendant's claims.

## A. STANDARD OF REVIEW

We review a challenge to the sufficiency of the evidence de novo. *People v Henderson*, 306 Mich App 1, 8-9; 854 NW2d 234 (2014). "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013) (quotation marks and citation omitted). "This Court review[s] a cumulative-error argument to determine if the combination of alleged errors denied the defendant a fair trial." *People v Hill*, 257 Mich App 126, 152; 667 NW2d 78 (2003).

## B. ANALYSIS

The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal." *Dobek*, 274 Mich App at 106. "To warrant reversal based on cumulative error, the effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial." *People v Schrauben*, 314 Mich App 181, 193; 886 NW2d 173 (2016) (quotation marks and citation omitted). For the reasons previously discussed, defendant has failed to establish any error, or much less any prejudice, with regard to the claims raised on appeal. As a result, he is not entitled to a new trial on the basis of cumulative error. See also *LeBlanc*, 465 Mich at 592 n 12.

To the extent that defendant raises a sufficiency of the evidence claim, we deem that argument abandoned, as defendant has failed to cite any authority or provide any explanation as to how the evidence presented was insufficient to establish the elements of his convictions. See *Kelly*, 231 Mich App at 640-641. Regardless, we have reviewed the *entire* lower court record in this case. It is overwhelmingly apparent that the prosecution presented sufficient evidence to support each of defendant's convictions.[17] Thus, we reject defendant's sufficiency of the evidence claim.

## XII. CONCLUSION

---

[17] See MCL 750.122 (witness tampering statute); *People v Mass*, 464 Mich 615, 629; 628 NW2d 540 (2001) (discussing the elements of conspiracy); *People v Justice*, 454 Mich 334, 345-347; 562 NW2d 652 (1997) (also discussing the elements of conspiracy); *Bennett*, 290 Mich App at 472 (stating the elements of first-degree murder); *People v Greene*, 255 Mich App 426, 435-439; 661 NW2d 616 (2003) (discussing MCL 750.122); *People v Crawford*, 232 Mich App 608, 616; 591 NW2d 669 (1998) (stating the elements of solicitation to commit murder); *People v Tower*, 215 Mich App 318, 320; 544 NW2d 752 (1996) (discussing the elements of obstruction of justice).

Defendant has failed to establish that any of his claims warrant relief.

Affirmed.

/s/ Jane M. Beckering
/s/ Jane E. Markey
/s/ Michael J. Riordan